IN THE CIRCUIT COURT OF TENNESSEE AT COVINGTON
THE TWENTY-FIFTH JUDICIAL DISTRICT

_____

STATE OF TENNESSEE,
          Appellee,

VS:                                    CAUSE NO. 6030

MICHAEL W. PARSONS,
          Appellant.

_____

TRANSCRIPT OF SENTENCING HEARING
JANUARY 8, 2010

_____

📄 COPY

THE HONORABLE JOE H. WALKER, PRESIDING JUDGE

<u>APPEARANCES</u>

FOR THE STATE:
     JAMES WALTER FREELAND JR.
     Assistant District Attorney General
     4709 Mueller Brass Road
     Covington, TN  38019
     (901) 475-2523

FOR THE DEFENDANT:
     J. BARNEY WITHERINGTON IV
     Attorney at Law
     P.O. Box 922
     Covington, TN  38019
     (901) 475-2700

Lynn S. Terrell
Official Court Reporter
Twenty-fifth Judicial District
State of Tennessee
(901) 388-8151

1                          **TABLE OF CONTENTS**

2                                                              Page

3     Appearances                                      i
      Table of Contents                               ii
4     List of Exhibits                                iii
      Style                                            1
5     Caption                                          1

6                      **FRIDAY, JANUARY 8, 2010**

7

8     DEFENDANT'S PROOF

9     MICHAEL PARSONS
          DIRECT BY MR. WITHERINGTON              7
10        CROSS BY GENERAL FREELAND               19
          REDIRECT BY MR. WITHERINGTON            45

11

12    RULING OF THE COURT ON DIVERSION            48

13    RULING OF THE COURT ON SENTENCING           54

14

15

16

17

18

19

20

21

22

23

24

25

1                              **LIST OF EXHIBITS**

2

3

4      1     Letters                                              5

5      2     Diversion Eligibility Certificate                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE CIRCUIT COURT OF TIPTON COUNTY, TENNESSEE
 2    ----------------------------------------------------------
 3    STATE OF TENNESSEE,
              Appellee,
 4
      VS:                              CAUSE NO. 6030
 5
 6    MICHAEL PARSONS,
              Appellant.
 7
 8    ----------------------------------------------------------
 9              This cause came on to be heard and was heard
10    on Friday, the 8th day of January 2010, before the
11    Honorable Joe H. Walker, Judge, holding the Circuit
12    Court for Tipton County, at Covington, Tennessee.
13              The following proceedings were had, to wit:
14                           *  *  *  *  *
15              THE COURT:  State versus Parsons, are you
16    ready on that matter?
17              MR. WITHERINGTON:  Yes, sir, I'm ready, Your
18    Honor.
19              Your Honor, before we begin the sentencing,
20    Mr. Parsons has asked that I raise two objections on
21    his behalf to the proceedings; one being that he
22    objects to being sentenced to any jail time as a result
23    of being denied the right to counsel under Argersinger
24    v Hamlin, which states that if you are denied the right
25    to counsel, that it's inappropriate to be sentenced to
```

1

1    jail time under such circumstances.

2         The second objection, Your Honor, is one that

3    I believe he's made already; that he had asked Your

4    Honor to recuse himself earlier, and he just wanted to

5    make sure that that was a part of the record, that he

6    had made that request

7         THE COURT:  Okay.  General.

8         GENERAL FREELAND:  Your Honor, Mr. Parsons has

9    been represented by Mr. Witherington, now the fourth

10   attorney, I think.  The public defender had a conflict,

11   but the other attorneys, Mr. Robbins and Ms. Mills,

12   with whom Your Honor is well familiar, and we've been

13   through this on numerous occasions, tried their best to

14   represent Mr. Parsons.  And had he listened to them, I

15   suggest he probably wouldn't be in the orange jump suit

16   he is wearing today.

17        So he's had attorneys.  He just hasn't

18   listened to them.  So we think that is not well

19   founded, that Motion.

20        THE COURT:  The Court has addressed both of

21   those issues already.  I'll be glad to address them

22   again if need be.  But today is the sentencing hearing.

23        Mr. Parsons' reason for recusal is, shortly

24   before trial date, the day before trial date, he filed

25   a civil lawsuit naming a number of people involved in

                                                        2

1    the judicial process, and I guess takes the opinion

2    that he can sue civilly the people involved and

3    therefore can no longer be prosecuted.  But the Court

4    didn't feel like there was a reason for recusal and

5    still doesn't.

6          And the defendant has had attorneys appointed.

7          Are you representing him today?

8          MR. WITHERINGTON:  Yes, sir, Your Honor.

9          THE COURT:  All right.  Are you ready to

10   proceed?

11         MR. WITHERINGTON:  Yes, sir, I am, Judge.

12         THE COURT:  The defendant was convicted by a

13   jury of three felony offenses and two misdemeanor

14   offenses.  The State has filed a Board of Probation and

15   Parole Investigation Report.  Have you been over that

16   with your client?

17         MR. WITHERINGTON:  Yes, sir, I have.  And

18   there are two corrections.  They are relatively minor

19   in the grand scheme of things, but they are corrections

20   nonetheless.

21         One is as to his educational background.  Your

22   Honor, he does make a notation he has a degree in

23   mechanical engineering.  It said that independent

24   verification was not requested due to his age, but he

25   did want that a part of his presentence report, that he

1    does have that degree in mechanical engineering.

2        And one additional, Your Honor, under military

3    information, he was a part of -- it does indicate he

4    was a part of Civil Air Patrol from 1992 to 1994, and

5    it states in here that he reports no military history.

6    He's indicated that that is, in fact, military.

7        Those are the only corrections, Your Honor.

8        THE COURT:  Okay.

9        MR. WITHERINGTON:  Otherwise, we stipulate to

10   its accuracy.

11       THE COURT:  The Court, then, will accept the

12   presentence report by stipulation, unless the State

13   wants to put on the officer.

14       GENERAL FREELAND:  No, sir.  I don't even know

15   that there's any disagreement, other than I assumed

16   that "civil" meant not military.  But it is not worth

17   quibbling about.

18       MR. WITHERINGTON:  He indicated that he had

19   military ID and it was federally funded, Your Honor,

20   and wanted that notation made.

21       THE COURT:  Okay.  The Court, then, accepts

22   the report by agreement.

23       Included in the report is the victim impact

24   statement, which the Court has read, and a statement by

25   the defendant, which the Court has read.

1          Does the State have any other witnesses?

2          GENERAL FREELAND:  Are Mr. King or Mr. Laxton

3    here?  Or anybody that wishes to be heard?

4          (No response.)

5          GENERAL FREELAND:  Your Honor, we'll rely on

6    the victim impact statements as they're included in the

7    investigation report and on the facts that came out in

8    the trial itself.

9          THE COURT:  Mr. Witherington.

10         MR. WITHERINGTON:  Your Honor, if I could

11   begin by introducing two exhibits.  One is a set of

12   letters.  If I could make this a collective exhibit?

13         THE COURT:  Yes, sir.

14         GENERAL FREELAND:  Could I see that?

15         MR. WITHERINGTON:  The other exhibit, Your

16   Honor, would be his Diversion Eligibility Certificate

17   from the Tennessee Bureau of Investigation.

18         (Exhibit Number 1, letters, was

19         marked and admitted as evidence.)

20         (Exhibit Number 2, Diversion

21         Eligibility Certificate, was marked

22         and admitted as evidence.)

23         MR. WITHERINGTON:  Your Honor, what I believe

24   now has been marked as Exhibit 1 is a set of letters

25   that Mr. Parsons collected from various members of the

1    community and on his behalf.  And particularly

2    pointing, I placed on top the letter of Mr. Hess, a

3    retired Navy officer.

4         And, Your Honor, I filed also a Motion to

5    Grant Judicial Diversion, with a Memorandum in support,

6    and that, of course, is what we are requesting of the

7    Court today.

8         And in terms of proof, I'd like to put on

9    Mr. Parsons first, if I could.

10        THE COURT:  All right, sir.

11        (Witness sworn.)

12        MR. WITHERINGTON:  Your Honor, I've just been

13   handed one additional letter.  I apologize to the

14   Court.  If we could make this a part of Exhibit 1.

15   It's one additional letter from a close friend.

16        THE COURT:  Yes, sir.

17        THE WITNESS:  Your Honor.  Your Honor.

18        MR. WITHERINGTON:  It's Ms. Vernie Cubing.

19        THE COURT:  I'll add it to this exhibit.

20        If you will take care of that, please.

21        THE COURT REPORTER:  Yes, sir.

22        MR. WITHERINGTON:  May I proceed, Your Honor?

23        THE COURT:  Yes, sir.  The last document that

24   you handed up was added to Exhibit 1.  Okay.

25        MR. WITHERINGTON:  Thank you, Your Honor.

1          THE COURT:  Yes, sir.

2

3                    DEFENDANT'S PROOF

4                    MICHAEL PARSONS,

5     having been duly sworn, was examined and testified as

6     follows:

7     DIRECT EXAMINATION

8     BY MR. WITHERINGTON:

9     Q.       Would you state your name?

10    A.       Michael Parsons.  And I've left my glasses

11    over on the desk.  I'm sorry.

12    Q.       And how old are you, Mr. Parsons?

13    A.       48.

14    Q.       And where do you reside now?

15    A.       Hughes Road, Brighton, Tennessee.

16    Q.       Okay.  Do you live on -- is it a farm?

17    A.       It's farmland.  We have a house, and we do hay

18    farming.

19    Q.       You have some acreage there; is that correct?

20    A.       Yes.

21    Q.       Okay.  And if we could go through some of your

22    social history.  What do you do for a living?

23    A.       I do a lot.  I have a business as a

24    professional home inspector.  I'm a consultant.  I do

25    work for the public, inspecting homes, commercial

1    buildings.  I act as expert witness from time to time
2    in the court system, advising litigants regarding the
3    condition of homes, if contractors did the job, if they
4    didn't do the job.
5         I'm also a licensed general contractor, more
6    of a consulting, paper pushing, as opposed to actually
7    driving nails type of job.
8         Again the hay farming business.
9         And up until recently, for the last year I was
10   a radio talk show host of a station in Millington,
11   Tennessee, doing a ministry of sorts for the public.
12   Q.        Okay.  What are your hobbies and interests?  I
13   know you mentioned the radio show.
14   A.        Most of my time is spent with my animals.
15   I've spent the last 30-some-odd years raising wolf
16   hybrids, dealing with wolves, working with zoos.  I
17   worked with the relocation effort back in '95 to bring
18   wolves from Canada to Yellowstone.  I was somewhat
19   instrumental in getting the program out at the zoo, the
20   Teton Trek, to include the wolves.
21        Former relations with the former curator at
22   the zoo, he used to buy hay from us, and he would come
23   out and enjoy seeing my wolf hybrids and would go in
24   and play with them, and so he knew their nature.
25        And I've spent an abundance of my life trying

8

```
 1    to dispel the lies and the myths about the villain, the
 2    wolf, when, in fact, there's never been a case in
 3    American history or Canadian history where a wild wolf
 4    has ever killed a human, but yet people are believed to
 5    fear an animal which has never harmed anybody.
 6    Q.       So is it fair to say, then, that you have a
 7    special connection with wolves?
 8    A.       Well, I do.  And it's more than just an
 9    interest, being three-quarters Cherokee and doing my
10    genealogy, finding out that I'm actually descended from
11    the wolf clan.
12             In the Cherokee Nation you have seven clans,
13    and the wolf clan was known for their -- well, they
14    domesticated wolves.  They used them for all sorts of
15    things.  But that was a part of my genetics, I guess,
16    so...
17    Q.       I understand.  Are you married?
18    A.       I am.
19    Q.       Okay.  What's your educational background?
20    A.       I have a degree in mechanical engineering.
21    Q.       Okay.  And where did you get your degree from?
22    A.       It's now called Southwest.
23    Q.       Okay.
24    A.       It's changed names.
25    Q.       And when did you obtain your degree?
```

```
1    A.        1988.

2    Q.        Okay.  As far as your criminal record, as I

3    understand it and we've submitted to the Court, you

4    have no criminal record before this incident; is that

5    correct?

6    A.        That's correct.

7    Q.        As far as your physical and mental health, are

8    you in good physical and mental health?

9    A.        Excellent.  Other than being gassed the other

10   day in the cell for about three hours, I'm okay.

11   Q.        Okay.  Have you ever been diagnosed with any

12   serious physical or mental condition?

13   A.        Never.

14   Q.        Now, going to the circumstances of this

15   offense, would you agree that this incident occurred

16   under unusual circumstances?

17   A.        Very unusual circumstances.

18   Q.        Would you agree that at least one of the

19   things giving rise, another of many factors involved,

20   but at least one of the things giving rise to this

21   incident was the fact that your wolf got out, out of

22   the enclosure?

23   A.        Well, Brandi is a wolf hybrid, and she did get

24   out of the back yard.  Apparently, while I was away,

25   she raised the latch on the gate and got out.  At that
```

1   time, as I understand it, there were several stray dogs

2   running in the area, and apparently she saw fit to go

3   play with them.

4        And when we -- when I got home, Pat called me,

5   went looking for them and heard gunshots.  Which we're

6   in a kind of a rural, even though within a square mile

7   there's about 82 homes, so it was a lot of homes, but

8   relatively speaking most people have five to 30 acres

9   or so, so it's not uncommon for people to target

10  practice.

11       And went looking for Brandi.  And my wife was

12  at the front of the property, and I had crossed over

13  the fence to investigate, and witnessed a person, who I

14  didn't know who it was at the time, which later was

15  identified as Barry Laxton, shooting in the direction

16  of where my dog was.  But just beyond my dog was my

17  wife standing in the wooded part of our field.  We

18  have -- the front of our property is wooded, lot of

19  pine trees.

20  Q.      Is that -- were you out there to recover your

21  dog?

22  A.      Yes.

23  Q.      Okay.  Would you agree, though, with my

24  original question, that at least one of the factors

25  that gave rise to this incident, that was necessary in

1    order for this incident to occur, was the fact that

2    your dog got out?

3    A.        That's correct.

4    Q.        And as I understand it, you have taken steps

5    to construct a secondary fence, or at least lay the

6    groundwork for that; is that correct?

7    A.        That's correct.  I've purchased a substantial

8    amount of fencing material to basically enclose the

9    back yard so that if somehow they climb out, dig out,

10   or get out, there's going to be another fence of about

11   seven foot tall that would, you know, prevent them from

12   going any further.

13   Q.        It's my understanding it's kind of an

14   extraordinary fence, though, of superior quality; is

15   that fair to say?

16   A.        It's not chain link.  It's not your back yard

17   fence.  It's cattle panel, which is about the thickness

18   of this pencil, very thick gauge material, suitable for

19   cattle, and large enough that, you know, it will keep

20   our pets in if they happen to get out of the chain link

21   fence, which is what we've got now, which is pretty

22   common for most people's yards, as chain link fencing.

23   Q.        Okay.  Now, I know you can't make a guarantee,

24   but in your opinion as an animal keeper, would this

25   secondary fence be sufficient to prevent your dogs from

1   getting out again in the future?

2   A.        I believe it will.

3   Q.        Will you make every effort -- when you are

4   eventually released, will you make every effort to make

5   sure that the dogs don't get out of your enclosures?

6   A.        Yes, I will.

7   Q.        And you've also indicated that you were going

8   to take some steps to educate your neighbors about the

9   dogs.  And what will you be accomplishing by doing

10  this?

11  A.        Well, during the trial I was impressed by one

12  of the ladies who was the mother of a man who lives in

13  the community, who I really don't know that well.  But

14  he had shown hostility in the past towards us for no

15  apparent reason other than he didn't know us.  Maybe

16  rumors.  Who knows?  You know, we've only been in the

17  county for, what, 12 years now, so we're relatively

18  new, as most people perceive if you weren't born here,

19  you're not from here, you're not really welcome.

20          But she expressed an interest to communicate

21  with us and that she's sorry that this thing had gone

22  so far.  And she really wasn't worried about our dogs.

23  I think the impression was that they are more hostile

24  towards me for no known reason.  But there seemed to be

25  an interest in building a bridge there.

1        And so what I would try to do, as when our

2   next door neighbors where Brandi was shot and killed,

3   when they moved there, the previous neighbors, they

4   came over and played with our dogs.

5   Q.       Okay.  Is it a fair summary of what you're

6   saying --

7   A.       So we've made an effort in the past.  Certain

8   neighbors have met our dogs and know about our dogs,

9   but certain ones haven't, just because we haven't had

10  the opportunity.  But it seems like there apparently is

11  now an interest in bridging that void.

12       And I'll take every opportunity, you know, as

13  much as people are interested, to expose my animals to

14  them so that they know that these are not aggressive

15  animals, if that's a concern, and let them know that we

16  are genuinely good people.

17       You know, despite having run for political

18  office doesn't necessarily, in my opinion, make you a

19  bad person.  I ran for issues, not against people.

20  Q.       Okay.  Getting directly to the mitigating

21  factors that we've mentioned in your Memorandum in this

22  case, do you feel that you acted under strong

23  provocation during that incident on September 24, 2007?

24  A.       I would say witnessing my dog being shot and

25  killed right in front of me, her dying at my feet, my

1   wife being shot at, and bullets flying past my head, I
2   would certainly say that's extremely strong
3   provocation.
4   Q.      Although you failed at least at trial to
5   establish in the eyes of the jury an affirmative
6   defense of self-defense and also that you were
7   effecting or effectively effecting a citizen's arrest,
8   do you feel that grounds under the circumstances
9   existed tending to justify or excuse your actions?
10   A.      I did everything that I knew to do according
11   to the law to protect myself to enact a citizen's
12   arrest, which is lawful.  Citizen's arrest has been on
13   the books forever.  The ability for one to defend
14   himself, the fact that you're not required to retreat.
15       I am a licensed permit carrier since 19 years
16   ago when I was issued a special permit through the
17   Shelby County Sheriff's Department because of my work
18   with the government as a pilot.  Never had to use a
19   gun.  Never -- didn't use a gun in this case, as a
20   matter of fact.  But the jury chose not to, I guess,
21   listen to what I was saying or whatever their case may
22   be.
23       The situation was that had he not crossed the
24   street off his property and shot 29 times at my family,
25   I wouldn't have been there.

15

1   Q.      Yes, sir, I understand that.  Now, this is

2   similar to the provocation question, but also another

3   statutory factor.  Do you feel that you were acting --

4   that you were under stress or duress at the time of the

5   incident?

6   A.      I would say that certainly I was under stress,

7   but I would say that my actions were reasonable and

8   restrained.

9           So many people I've spoken to said that if

10  somebody is shooting at them, they're going to shoot

11  back.  And it was like I tried to explain, that if you

12  weren't there, you really don't know.  And the fact

13  that the distance between us was such that shooting

14  back at him while he's shooting at me, yes, I might

15  have hit him, but I might have missed and jeopardized

16  people behind him, if, in fact, there were people in

17  the house behind.

18          My interest was to stop the threat against my

19  family, not to harm anyone, to preserve everyone's

20  life.  And that's --

21  Q.      I understand that you considered your response

22  to the situation to be controlled and a rational

23  response.  But would you agree, or is it true at least,

24  that it was also an emotional and a stressful

25  situation?

1    A.       Certainty.

2    Q.       Did you assist the authorities in uncovering

3    any of the property involved in the incident?

4    A.       As a matter of fact, I confiscated the rifle

5    that the shooter had used to shoot at my family, which

6    was laid in the back of a truck.  He had concealed it

7    immediately after the shooting and would not reveal its

8    location when I had asked him multiple times.

9            When I saw it, I confiscated it as well as a

10   paddle holster which I knew would be able to show the

11   officers, in fact, that both men had been armed.  In

12   case they tried to deny it, I would have the proof,

13   physical proof, to show them both men were armed.

14           And when the deputies arrived, immediately I

15   presented them with the rifle and the holster and

16   advised them of the crimes, the felonies that I had

17   witnessed, which would have been the basis for the

18   citizen's arrest.

19   Q.       Okay.  As far as their investigation of you,

20   though, did you cooperate fully in their investigation

21   of you?

22   A.       Oh, certainly.

23   Q.       Okay.  Did you turn over anything that you had

24   that they were interested in?

25   A.       Yes.  Immediately gave them the pistol that I

17

1    had so that they would know that there's no danger to
2    anybody.
3    Q.        Would you say that you're genuinely sorry that
4    this incident occurred?
5    A.        Certainly.
6    Q.        Can you assure the Court that you will do
7    everything within your power to make sure that these
8    sort of circumstances don't arise again in the future?
9    A.        Immediately we're going to have the fence put
10   up.  I'll be working to finish the fence that I had
11   already started.  We've got the material.
12            And we're looking at, you know, other things,
13   such as possibly moving from the area.  Because
14   apparently if the threat to my family is so great that
15   people are willing to cross the street and shoot at us
16   and they're not held accountable, then this is no place
17   to live.
18   Q.        Okay.  If the Court sees fit to grant you a
19   diversion, would you be willing and able to comply with
20   any of the reasonable terms of that probation or
21   whatever they may be?
22   A.        I think "reasonable terms" is the key word.
23   Q.        Well, ordinary terms of probation, such as
24   submitting to supervision if necessary and reporting to
25   a probation officer on a monthly basis for whatever

1    period, that would be --

2    A.        If that's required, certainly.  I'm not going

3    anywhere unless we're able to move, and then I would

4    ask to be allowed to transfer probation, if that be the

5    procedure.

6    Q.        Okay.  All right.  Do you have --

7    A.        I'm not familiar with all the procedures, so

8    I'm...

9    Q.        Okay.  Do you have plans on relocating soon?

10   A.        Well, that's, you know, this economy, it's

11   very tough to buy or sell property.  And that's a

12   situation we'll have to try to look at very closely and

13   see if anything can be done.

14   Q.        But for today's purposes are you asking the

15   judge to grant you diversion and allow you to return

16   home to your family and to your work?

17   A.        Yes.

18             MR. WITHERINGTON:  If you will answer any of

19   Mr. Freeland's questions.

20

21   CROSS-EXAMINATION

22   BY GENERAL FREELAND:

23   Q.        Mr. Parsons, you're three-quarter Cherokee?

24   A.        Correct.

25   Q.        So one parent is full Cherokee, and the other

```
 1    is --
 2    A.        Excuse me?
 3    Q.        -- half Cherokee?  Is that what you're saying?
 4    A.        Not at all.
 5    Q.        I'm sorry.  So what do you mean by
 6    three-quarter Cherokee?
 7    A.        That's a percentage.
 8    Q.        I understand.  Would not one parent have to be
 9    full-blooded Cherokee --
10    A.        Not at all.
11    Q.        -- and one parent have to be half Cherokee for
12    you to be three-quarter?
13    A.        No, sir.  Both parents could be three-quarter
14    Cherokee.  One could be a various percentage.  You'd
15    just add the two numbers and divide by two, and you get
16    the ratio.
17    Q.        Okay.  Tell me.  This really has nothing to do
18    with anything other than your perception of reality.
19    One parent was what percentage Cherokee?
20    A.        If you turn around and look behind you, you'll
21    see my mother who is Cherokee.
22    Q.        All right.
23    A.        And you'll see my father who is Cherokee.
24    Q.        Your father --
25    A.        They are right behind you.
```

1   Q.       As far as you understand, your father is what

2   percentage Cherokee?

3   A.       In doing the genealogy study, my father is

4   full-blooded Cherokee.

5   Q.       Well, that's what I asked you.  So one parent

6   is full-blooded Cherokee?

7   A.       But the assumption is that the ratios come

8   from one being one, one being the other.  But the

9   reality is, is they can come from various degrees.

10   There may be somewhere in history of my mother where

11   there is more Cherokee or less.  To the degree that

12   we've been able to establish, this is the percentage

13   that we have.

14   Q.       Okay.  Mr. Parsons, the bottom line is you

15   don't see reality as the rest of the world sees

16   reality, do you?  Because three-quarters means one plus

17   a half divided by two is three-quarters.  You argue

18   even with that.

19   A.       Or three-quarters and three-quarters equals

20   three-quarters.

21   Q.       Six-quarters -- all right.

22           You were asked about your mental health, and

23   your opinion is that you enjoy good mental health?

24   A.       That's a fact.

25   Q.       Weren't you examined in connection with this

1    trial regarding your mental health?

2    A.        The evaluation was at the direction of one

3    court-appointed attorney who had, well, in fact,

4    assaulted me and didn't want to be on the case at all.

5    Hers was a retaliation.

6         And ultimately the evaluation came back that

7    there was no reason why I couldn't -- the evaluation

8    was to determine if I could assist in my own defense

9    and the nature of what happened at the scene.  And the

10   response of the doctor who did the full evaluation,

11   Dr. Sioka, was that I acted rational, responsible, and

12   that there's no reason that I couldn't assist in my own

13   defense.  And he was quite curious as to why I was ever

14   even sent to have the evaluation.  Because normally --

15   Q.        Mr. Parsons --

16   A.        -- people that present themselves, as he said

17   in my case, aren't evaluated.  It's normally people who

18   truly need assistance from --

19   Q.        Mr. Parsons --

20   A.        -- that standpoint.

21        MR. WITHERINGTON:  Excuse me.  If I could

22   object.  Excuse me.

23        GENERAL FREELAND:  Object to Mr. Parsons?

24        MR. WITHERINGTON:  No.  Object to further

25   questioning on this line.

1          I didn't have the benefit, Your Honor, of

2    being his attorney at the trial level, and in my

3    earlier discussions with Mr. Parsons, as I understood

4    it, the psychological report, one or another of them

5    was excluded from the record.

6          So if we're discussing -- if we're discussing

7    a report that was excluded from the record, I'd object

8    on that basis, that it not come in now.

9          THE COURT:  They're both in the record.

10   Mr. Parsons filed a Motion to have one excluded.  The

11   Motion was denied.

12          MR. WITHERINGTON:  Thank you, Your Honor.

13          THE COURT:  Yes, sir.

14

15   BY GENERAL FREELAND:

16   Q.       All right.  Mr. Parsons, in getting back to my

17   observation to you that you don't see reality as others

18   do, I asked you a question which called for a yes or no

19   answer.  So there was an evaluation; in fact, there

20   were two evaluations done, mental evaluations done of

21   you, correct?

22   A.       That's not correct.

23   Q.       There were not two evaluations done of you?

24   A.       There were no two evaluations.  There was one

25   full evaluation.  There was another attempted

1    evaluation where the officer could not locate the

2    building and which was subsequently the reason why I

3    was arrested the first time, because I was not able to

4    make a appointment.

5           Which the address given to me was the wrong

6    address.  I was not provided a phone number.  And when

7    I missed the appointment, I was arrested.

8           And then even the officer who took me to the

9    appointment couldn't find it.  We were late.  Thereby

10   the doctor only had about 30 minutes to do an

11   evaluation that would have taken two hours.  And in his

12   own notes he said it was an incomplete evaluation.

13          But as you understand, I like to give long

14   detailed explanations, and in his evaluation he tried

15   to claim that I gave short answers, which anybody that

16   knows me knows that's not the case.

17   Q.        Well then, there were two evaluations,

18   attempted evaluations --

19   A.        No, sir.

20   Q.        -- visits to a doctor, you saw two people,

21   right?

22   A.        Seeing two people is not the same as having

23   two full evaluations.

24   Q.        One evaluation you agreed with and one you

25   didn't?

1    A.        No, sir.   One was not a complete evaluation.

2    It was a recommendation to continue and complete a full

3    evaluation.   And it should also be --

4    Q.        And that's Dr. Wyatt, correct?   The evaluation

5    or recommendation to which you're referring is

6    Dr. Wyatt?

7    A.        And I believe when I made the Motion that that

8    be stricken from the record, if I'm not mistaken, it

9    was agreed upon that it would be stricken.   That's why

10   it's in seal.

11   Q.        Yes, sir.   Your Honor -- Mr. Parsons, we

12   didn't proceed with it at trial because it wasn't

13   particularly relevant.

14             But your attorney asked you if you enjoyed

15   good mental health.   You said you did.   But the fact of

16   the matter is that there have been professionals that

17   have disagreed with that, have there not?

18   A.        Well, that's not true.   The record will

19   clearly show that his evaluation was incomplete, and he

20   recommended further evaluation.   Once a full evaluation

21   was done, the doctor concluded there is no reason for

22   me not to be able to proceed to trial to assist in my

23   defense, and that my actions were reasoned and

24   responsive to the situation.

25   Q.        So you don't have, obviously, any objection to

1    either of these reports being considered by the judge

2    in your request for probation under diversion or

3    probation?

4    A.        I would object to Dr. Wyatt's simply because

5    Dr. Wyatt, as the professional doctor told me,

6    Dr. Wyatt sees criminally mentally ill patients every

7    day, and I would be an enigma to him.  He is not used

8    to interviewing people --

9    Q.        Well, Mr. Parsons, you're an enigma to a lot

10   of people, aren't you?  Aren't you?

11   A.        I don't believe so.

12   Q.        Well, let me ask you about the unusual

13   circumstances Mr. Witherington asked you about, the

14   unusual circumstances relating to your -- the animals

15   getting out.  That's not an unusual circumstance at all

16   for you, is it, that you've let your wolves, dogs, get

17   out?

18   A.        We've had our property for 12 years, sir, and

19   in 12 years we've only had an animal get out three

20   times.  When we lived in Memphis for 17 years, we had

21   animals get out twice.

22   Q.        Well, every --

23   A.        That is not unreasonable.  And as a matter of

24   fact, in the news recently a person's dog got out in

25   the county a couple of weeks ago.  The neighbor turned

26

1   on the light and shot and killed it, and she wants

2   answers.  Apparently the green light's been given for

3   people to randomly kill people's pets and nothing will

4   happen.

5   Q.      All right.  The --

6   A.      That's a concern to the community.

7   Q.      The question to you, Mr. Parsons, is, is it an

8   unusual circumstance or not for this situation to

9   develop about your wolf-dogs getting out?  And how many

10  times have you been prosecuted for wolves, dogs, at

11  large, whatever?  How many times have you been

12  criminally prosecuted for it?

13  A.      Never.

14  Q.      You have never been in General Sessions Court

15  on a charge of your dogs running at large?

16  A.      That's not a criminal charge, sir.  That's --

17  Q.      Well, it is a criminal charge, Mr. Parsons.

18  A.      No, sir, it is not.  No, sir.  That's a civil

19  matter.  If you look at the statutes, that's civil, and

20  you know that.

21  Q.      Well, Mr. Parsons, I don't know that.  But in

22  any event, how many times have you, in your opinion,

23  been civilly prosecuted --

24  A.      So now you don't know that?

25  Q.      -- for dogs running at large?  How many times

1   have you been over there in the civil part of General

2   Sessions Court, under Judge Peeler, with the district

3   attorney or Mr. Duke Brasfield involved in the

4   prosecution for your dogs running at large?

5          THE WITNESS:  May I answer that question

6   fully, Your Honor, since I was sworn to tell the whole

7   truth?

8   Q.      Well, first of all, if you would answer it,

9   fully or not.

10  A.      I would like to fully answer that and not be

11  shut off.

12  Q.      How many times?

13  A.      The fact is, is that when my dog got out and

14  was shot by a neighbor four years ago, I wasn't even

15  there.  My wife was there.  She was originally

16  charged.  And then when I came back to Memphis -- or to

17  Tipton County, when I returned home, they dropped the

18  charges against her and charged me because I was the

19  person they wanted to charge.

20         This is political.  This is the only place

21  that I know of in this country where they prosecute

22  individuals for a dog getting out of the yard and allow

23  the neighbors to shoot and kill a dog on sight.

24  Q.      Prosecute?  I thought you said it was civil.

25  A.      You prosecute civilly as well as criminally,

1    sir.

2    Q.        All right.  Well, how many times, to answer

3    the question that I asked you, how many times have you

4    been prosecuted civilly in General Sessions Court of

5    Tipton County for your wolf-dogs running at large?

6    A.        I believe that case was expunged.

7    Q.        Can you answer a question, Mr. Parsons?

8    A.        One time.

9    Q.        One time?

10   A.        One time.

11   Q.        All right.

12   A.        That's the only time in my life --

13   Q.        That's the only time you've been to court?

14   A.        That's the only time in my life I've ever had

15   a complaint against my dogs.  And in that case, Animal

16   Control came on my property and confiscated three of my

17   dogs, sitting on my porch, and claimed that they were

18   running loose, which the statute says the animals have

19   to be off your property.  That's why when it came to

20   the Circuit Court it was dismissed.  The prosecution

21   decided not to prosecute because they knew they didn't

22   have a case.

23   Q.        The prosecution?

24   A.        Your prosecutor didn't prosecute because you

25   had no case.  The dogs were on my property.

1    Q.        The State of Tennessee's prosecutor?

2    A.        Yes.

3    Q.        On a civil case?

4    A.        Yes.

5    Q.        Do you know the difference in a civil or

6    criminal case, Mr. Parsons?

7    A.        Yes, I do.   This Court handles both civil and

8    criminal cases.

9    Q.        And do you know that the State didn't want to

10   prosecute because they didn't want to deal with you any

11   more than they had to, the State of Tennessee in

12   prosecuting you, that that was the reason?

13   A.        Apparently -- no, sir.   It's because my dogs

14   were on my property, and they didn't have a case.   You

15   can't prosecute people for civil penalties when the

16   person didn't violate the statute.

17   Q.        All right.   Mr. Parsons --

18   A.        Which seems to be a problem in this court.

19   Q.        You say that the only compliant that you have

20   had about your dogs running at large was that one time

21   in General Sessions Court?

22   A.        You asked me was that the only time I'd been

23   in a courtroom, and that is a fact.   In my life that's

24   the only time I've been in a courtroom.

25   Q.        I'm following up on what you said.

A.        But that matter --

Q.        You said the only --

A.        No, you're not.  You're twisting what I said.
What you asked me was, in fact, was that the only time
I was in court, which the only --

Q.        I asked you that, and you responded that --

A.        -- in court --

Q.        Mr. Parsons, I asked you that, and you
responded that the only complaint that you had had
about your wolves was that one complaint.  That's not
true, is it?

A.        Please refer to my wolf hybrids as wolf
hybrids, not wolves.

Q.        The only -- it's not true that the only
complaint that you've had about your wolves is that one
time in General Sessions Court, is it, Mr. Parsons?
You've had numerous complaints?

A.        No, sir, that's not true.

Q.        Brent Seay killed one of your wolves, and you
broke his nose in response to it, didn't you?

A.        When he attacked me, I punched him one time.
The man attacked me.  He shot and killed my dog, off
his property on someone else's property, while I'm out
looking for it.  Before, I had told him that I was
looking for my dog, he said, "We haven't seen it."

1         Moments later, when I drove away, he saw it

2  and shot and killed it, without provocation, on someone

3  else's property.  And then when the officers arrived,

4  he attacked me, and in defense of myself I punched

5  him.  That's why I wasn't prosecuted for that.

6         As a matter of fact, the Grand Jury came back

7  with a Not True bill, because they thought the whole

8  thing was a sham.

9  Q.      Well, Mr. Parsons --

10  A.      But that didn't --

11  Q.      -- my question to you was --

12  A.      You asked if there was --

13  Q.      -- my question to you, Mr. Parsons --

14         MR. WITHERINGTON:  Your Honor, I think he's

15  trying to continue to answer the question.

16         GENERAL FREELAND:  I think he's trying to

17  evade the answer, Your Honor.

18  A.      There's never been a complaint -- there's

19  never been a lodged complaint in any court in any state

20  in this country or the universe, other than the one

21  time where the Animal Control went on my property

22  without provocation and stole three of my dogs.  And

23  that was their own complaint.  There is no other

24  complaints in the record anywhere.

25  Q.      Okay.  Listen to me, Mr. Parsons.  You said

1   crossed the street to kill my dog, shot 29 times, and

2   he went out of his way.  So that's his complaint,

3   because he broke the law?

4   Q.      Mr. Parsons, how many of your wolves have been

5   killed by your neighbors when they were not on your

6   property?

7   A.      They weren't on their property either, and it

8   was three.

9   Q.      All right.  In fact, some of them you have

10  sued because of that?

11  A.      That's fact.  That's what you do.  You hold

12  people accountable for their crimes.

13  Q.      Is that what you're asking this Court to do?

14  A.      This Court doesn't have a civil case before

15  them where I'm suing them in regards to a person

16  killing my dog at this time.

17  Q.      You don't want this Court to hold people

18  responsible for the criminal actions that they do?

19  A.      Defending your family is not a criminal act.

20  Q.      Well, that may be.  But the jury said you're

21  guilty.  My question is --

22  A.      A jury who was employed by --

23  Q.      -- do you want this Court --

24  A.      -- the county, who lied under voir dire.  One

25  of the jury members was the arresting officer's

1   mother-in-law who has a lawsuit against him, and I

2   asked her --

3         MR. WITHERINGTON:  Your Honor, I would object

4   to the line of questioning, in any event, as to his

5   opinion as to how the judicial system should function,

6   as not relevant, Your Honor.

7         GENERAL FREELAND:  I'm trying to determine,

8   Your Honor, his amenability to probation, which he is

9   requesting, and diversion and in other probation.

10        THE COURT:  The Court will allow the question.

11  The objection will be overruled.

12  Q.      Mr. Parsons, you have stated that you believe

13  that people should be responsible for their criminal

14  actions.

15  A.      Yes, I do.

16  Q.      The jury has found you to be criminally

17  responsible for the aggravated assault on two

18  individuals.  Now, you will agree that under our system

19  of laws, that your opinion doesn't rule, but the

20  opinion of the jury, affirmed by the Court, controls,

21  don't you?

22  A.      That's correct.

23  Q.      Okay.  Because Mr. Witherington asked you if

24  you would agree to -- I think Mr. Witherington's words

25  were "reasonable terms of probation," and you stated

1    that the determinative factor there would be whether

2    the terms are reasonable.

3    A.       I've never been provided any terms or anything

4    to that matter, so I can't respond.  I don't understand

5    what that term means.  Therefore, I was needing to

6    qualify what that means.

7    Q.       Well, it's a pretty simple question.  You were

8    asked a simple question:  Would you be bound by any

9    reasonable terms of probation?  And your immediate

10   response would be that the determinative issue is

11   whether those terms are reasonable.

12            Who determines that, Mr. Parsons?  You?

13   A.       I believe that's for the judge to decide.

14   Q.       Okay.  So whatever the judge determines to be

15   the reasonable terms, you will agree to, correct?

16   A.       Certainly.  And I would ask that the term

17   "reasonable" be prudently exercised, because certainly

18   there are, within the Court's discretion, things that

19   might be extreme.

20            And in this case, no one was touched, other

21   than my dog was shot and killed.  This is not a case

22   where I pursued them out of anything other than defense

23   of my family, in the moment where I was imminently in

24   danger at that moment of being killed.

25   Q.       And your idea as to what a reasonable term of

1    probation, Mr. Parsons, is, would be just as your

2    determination of what reality is as you've expressed it

3    all through these proceedings, correct?

4    A.        I'm not sure what your point is.

5    Q.        Well, my point is that everything that you

6    have said happened has been determined not to be the

7    case by juries, and your perception of reality doesn't

8    seem to coincide with at least the majority rule, if

9    that's correct, of what reality is; would you agree

10   with that?

11   A.        Not at all.   The jury did not find reality.

12   The jury just made an opinion.   Regardless of whether

13   they cared that this man shot at us 29 times, which is

14   a fact, it's not a reality beyond the scope of the

15   Court's record.   In their mind they may think that that

16   was okay to shoot at someone's dog if you don't feel

17   that you're safe, where there's a dog that you don't

18   understand.

19            In the real world people don't just shoot at

20   people's pets.   That's a crime.   And in the state

21   Tennessee, the clear law says that anything less than a

22   full-blooded wolf is a domestic pet, and therefore, is

23   regulated as such and has to be treated as such.

24            And my dogs have never harmed anybody.   So the

25   reality is in this case my dog was shot and killed, my

1    wife was shot at, I was shot at.

2    Q.        And Mr. Witherington asked you about what

3    steps -- or steps to be taken to educate your

4    neighbors.  What have you got in mind about educating

5    everybody and enlightening them on wolf hybrids?

6    A.        Well, I'll make every attempt to speak with

7    the neighbors, that they have nothing to fear of me or

8    my dogs.  And certainly the lady who expressed interest

9    in that, I would try to contact her immediately and

10   take one of my wolf hybrids over there and let her see

11   them and pet them.

12        And you know, if she's amenable to that, I

13   think she'll learn that they're just like anybody

14   else's pet.  They're friendly, not aggressive at all,

15   great family pets, as a matter of fact.  There are

16   dozens of them throughout the county right now.

17   Q.        Mr. Parsons, you're not suggesting that you're

18   going to go door to door trying to educate people and

19   carrying your wolf hybrids with you, are you?

20   A.        I would try to contact -- the people in this

21   area pretty much know each other.  And I think if I

22   spoke with her and she had a good understanding of who

23   we are and our animals, certainly I think the phones

24   would ring and she would be talking to her neighbors.

25   Because obviously there is a lot of communication

1    amongst the neighbors.

2    Q.      All right.  You're not going to go door to

3    door with your wolf hybrids to educate them?

4    A.      Well, the people across the street already

5    know us.  And our neighbors, the Stewarts across the

6    street, don't have a problem with our animals.

7    Q.      Well, I'm just trying to figure out what is

8    meant by --

9    A.      There are several neighbors --

10   Q.      -- your taking steps to educate neighbors.

11   A.      There are several neighbors that know us and

12   like our animals.  And it's just about four families

13   that -- that don't.

14   Q.      Those families that don't know you or don't

15   like you or don't know your wolves or know how

16   wonderful they are, are you going to take steps to

17   educate those people?

18   A.      I think the lady will communicate with them.

19   This is the lady who is part of that group of people

20   that have that viewpoint.

21   Q.      Okay.

22   A.      And she expressed interest in meeting with us

23   and speaking with us, and so we're going to take that

24   opportunity to do that.  But I don't know about your

25   suggestion of going door to door --

39

1    Q.       Oh, I'm not -- don't say that's my suggestion,

2    Mr. Parsons.  It's my question to you.  Is that your

3    plan?

4    A.       No, sir, that was not my intent.

5    Q.       Okay.  Now, Mr. Witherington asked you about

6    the fence that's now being constructed, I guess, that

7    will keep the -- how many hybrids do you have now,

8    approximately?

9    A.       I haven't been here in 46 days.  I have no

10   idea.

11   Q.       Well, how many do you sell on a -- would it be

12   much different?  Do you sell them on a daily or weekly

13   or yearly basis?

14   A.       No.

15   Q.       Okay.  Do they --

16   A.       We normally have, at the most, one litter a

17   year, and usually they're presold.  And if we have any

18   left over, then we'll run an ad in the paper.  But, no,

19   we normally have less than -- on average in the last

20   ten years, less than one litter a year.

21   Q.       All right.  Have you communicated with your

22   wife since you've been in jail?

23   A.       Yes.

24   Q.       You know exactly how many hybrids you've got,

25   don't you?

40

1    A.       No.   Because we had a litter of puppies, and I

2    don't know exactly what she sold and what we have.

3    Q.       Mr. Parsons, can you answer any question

4    straight out?   How many hybrids do you have at your

5    house?

6    A.       I don't know.   I'm not there.

7    Q.       Do you know within a range of 50 or 100 how

8    many you've got?

9    A.       I think I've answered that question before.

10   It's about 30.

11   Q.       Well, you finally did, Mr. Parsons.   It's

12   about 30.

13   A.       We've covered that before.   And with puppies,

14   I don't know.   I'm not there.

15   Q.       All right.   About 30.   That's good enough.   So

16   you're building a fence, or a fence is being

17   constructed, that you believe will be -- keep this

18   unusual circumstance of a hybrid escaping, it will keep

19   that from happening again?

20   A.       I think it will.   But it's not against the law

21   for a dog to get out of a house or out of a back yard

22   and run around.   That's not a crime.

23   Q.       All right.   We're trying to --

24   A.       Is it?

25   Q.       -- address what you called the "unusual

41

1    circumstance" of your hybrids getting out.  The point

2    is that you were before the General Sessions Court how

3    many years ago was it now that this matter first came

4    up on your hybrids being at large?

5    A.       Six years ago, I believe.

6    Q.       Six years ago you were telling Judge Peeler of

7    the efforts you were making to make a fence that would

8    keep these hybrids in.  That was obviously some years

9    before these hybrids that were the subject of this

10   criminal action got out.

11   A.       No, sir, that's not true.  What I did is I

12   presented photos.  They had requested to see what the

13   fences looked like, and I showed them that apparently

14   someone had opened the gate and let our dogs out.  We

15   had six-foot-tall chain link fencing, and that we were

16   going to put locks now on the gate latches so that

17   someone couldn't just come and open the gate.

18        And the fact that our dogs were on our porch,

19   on our property, when they were stolen by Animal

20   Control was the reason the charges were dropped,

21   because the State didn't have a case.  It was a

22   politically motivated attack.

23   Q.       The State?  I thought it was a civil action.

24   A.       The State prosecutes civilly.  You're a

25   prosecutor, and you represent the State, and you're in

1    the General Sessions Court, correct?

2    Q.        And that's a civil thing?

3    A.        Do you not prosecute civil matters?

4    Q.        No, sir, Mr. Parsons, I don't.

5    A.        You don't?

6    Q.        No, sir.  Those are criminal actions.

7    A.        I believe it's civil.

8    Q.        I defer to you, Mr. Parsons.

9    A.        Does it carry jail time to have animals get

10   out?

11   Q.        Yes, sir, it does.

12   A.        Okay.  I was told it was a civil matter, there

13   was just a fine.

14   Q.        This unusual circumstance of your wolf hybrids

15   getting out is not unusual at all, and it will continue

16   to be a problem.  You either are unwilling or unable to

17   address it; isn't that true?

18   A.        Not at all.  I think we've sat here and

19   discussed that over the course of 12 years now our dogs

20   have gotten out three times.  And the fact is, is that

21   we've made provisions to correct the problem.  And

22   putting up this additional fencing, if they do get out

23   of the six-foot fencing by opening a gate or squeezing

24   through or whatever, that they will be contained in

25   there.

1    But the fact is, what's being missed here is

2    these are not aggressive animals.  People attacking our

3    animals out of hate towards me is the reality.

4    Q.    Mr. Parsons --

5    A.    And that's why we're look at moving.  It's not

6    an issue of the dogs getting out.  It's an issue of

7    people attacking my family because they just don't like

8    me because I'm not part of this Old Boy System and I

9    ran for office.

10    The fact that the defendants -- or the State's

11    witness said that he was mad at me and he supported the

12    other candidate, and at the scene he even said, "You

13    should have kept your dogs in."

14    And he wasn't in fear.  He was on a hunt to

15    kill my dog.  He knew they were my dogs.

16    Q.    And this is reality according to you?

17    A.    No, it's testimony by your witness.

18    GENERAL FREELAND:  That's all.

19    THE WITNESS:  His own write-up.

20

21

22

23

24

25

1    REDIRECT EXAMINATION

2    BY MR. WITHERINGTON:

3    Q.        Mr. Parsons, just briefly to follow up.

4             As to the mental health issue, have you been

5    diagnosed by any doctor or psychologist with a mental

6    health issue?

7    A.        No, sir.

8    Q.        Okay.  How long would it take you to construct

9    this fence that you feel will contain the dogs fully?

10   A.        Not knowing the weather conditions, it's hard

11   to say.  Probably two to three months, given the

12   current climate, the temperatures, and weather in the

13   wintertime.

14   Q.        Okay.  Is it fair to say that all of your

15   appearances in the courtroom, whether they be civil or

16   criminal, have had to do your dogs getting loose?

17   A.        One could say that.  But I would say the

18   State, the government, coming on my property, stealing

19   three of my dogs when my dogs are on my property, and

20   falsely charging me, was an attack on me personally.

21   Q.        Well, however the cases turned out in the end

22   in the circumstances, would you agree with me that what

23   gave rise to the incident, or at least a necessary

24   factor, was the dogs getting out of the enclosure?

25   A.        I think that was the excuse that was used to

1    come after me, yes.

2    Q.        Okay.  Is it fair to say, though, that those,

3    every incident that's caused you to be in court, would

4    not have happened but for the dogs getting out of the

5    pen?

6    A.        Those were contributing factors.

7    Q.        Okay.

8    A.        But the fact that dogs on your property is not

9    a crime still exists.  And the fact that he had no

10   right to cross the street and shoot my dog still

11   exists.

12            And so I'm taking every efforts (sic) to make

13   sure that my dogs aren't attacked any more by keeping

14   them, you know, in the yard and on the property.

15   Q.        Okay.  Let me ask the question this way:

16   Assuming the fence is built that would contain the dogs

17   in fully, given your history in the past, would this

18   new enclosure prevent all of the past incidences, all

19   of the circumstances of the past incidents from

20   happening in the future?  Would that avoid all of those

21   different occurrences, whether they were civil or

22   criminal?

23   A.        The first event, the first incident, was where

24   the lock was -- there was not a lock on the gate, so

25   that was resolved by putting locks on the gate so

46

1    people couldn't come open the gates.

2            And the second occurrence happened where we

3    just had Brandi excited to see other dogs in the

4    neighborhood, and she squeezed past the gate.  And so

5    we put two latches on the gate so that she couldn't

6    squeeze out.

7            And so now, you know, the dogs don't climb the

8    fences.  The dogs don't dig out of the fences.  It's

9    always been through a gate.  But we're doing a larger

10   enclosure to give them, you know, that secondary

11   fencing, so that if they do happen to get, you know,

12   out somehow, they're going to be, you know, right there

13   within, you know, the yard.  They're not going to go

14   beyond the yard.

15   Q.      Okay.  So the fence is taller and heavier?

16   A.      Oh, yeah.  Seven foot.  It's heavier material,

17   and, yeah.

18   Q.      In your opinion it's going to keep your dogs

19   in permanently?

20   A.      Well, yeah, unless we're walking them.

21   Q.      Okay.  And assuming the judge made it a

22   condition of your probation to complete this secondary

23   fence, would you consider that a reasonable term of

24   your probation?

25   A.      Certainly.

1    Q.        To, say, complete the fence in 90 days?

2    A.        Certainly.  And we're talking about enough --

3    the stack of fencing is three feet tall.  We're talking

4    about fencing off an acre and a half.  And doing it

5    myself, it just takes some time.  So it's not a

6    situation where I can go out there and in a week put up

7    this fence.

8    Q.        Okay.  But if it were a term of your probation

9    to, say, complete it within 90 days, would that be

10   feasible?

11   A.        Yeah.  I think three months would be

12   reasonable, and I would do everything possible.

13   Because I know January is certainly going to be a hard

14   month.  February, the beginning is not so good.  But

15   the middle of February, it's usually getting better to

16   where you can do work outside and...

17            MR. WITHERINGTON:  Thank you, Mr. Parsons.

18            GENERAL FREELAND:  No further questions.

19            THE COURT:  You can step around.

20            (Witness excused.)

21            MR. WITHERINGTON:  No further proof, Your

22   Honor.

23            THE COURT:  The defendant presented this same

24   statement of how the events unfolded to the jury.  The

25   jury rejected the defendant's version and accredited

1    the testimony of the victims, Mr. King and Mr. Laxton.

2         The defendant still fails to appreciate the

3    wrongfulness of his actions, where he held a loaded

4    handgun to the head of the victims and threatened to

5    kill them.

6         The request for a diversion of the sentencing

7    hearing will be denied, so we can proceed to

8    sentencing.

9         Does the State have anything else to present

10   other than --

11        GENERAL FREELAND:  No, sir.  We would submit

12   it on the facts that came out at trial and the

13   presentence report and Mr. Parsons' testimony.

14        MR. WITHERINGTON:  Your Honor, we'd submit to

15   the Court that under 40-35-113 that mitigating factors

16   number two, three, seven, and then nine through 12

17   apply on his behalf, that being that he acted on strong

18   provocation.

19        Your Honor, of course, I wasn't present at

20   trial, but it's my understanding of the facts and based

21   on what I've seen today that clearly, you know, he

22   acted under strong provocation, you know.

23        And the Court has, I know, heard his share of

24   animal cases, and they're emotional.  I mean, they are

25   always something people want to avoid even touching,

1    his attorneys, because the emotions run so strong.  So

2    clearly he did act under strong provocation.

3         And although the grounds, and as Your Honor

4    just stated, the grounds didn't exist, at least in the

5    jury's eyes, to justify self-defense, a finding of

6    self-defense as an affirmative defense, and they, of

7    course, didn't find that he was properly effecting a

8    citizen's arrest, that substantial grounds existed,

9    under subsection 3, tending to excuse or justify his

10   conduct.

11        And, Your Honor, under subsection 9, I think

12   it's not disputed, at least, that he assisted the

13   authorities, and at least he felt also that under the

14   circumstances that he was effecting his own citizen's

15   arrest.  So, of course, he was cooperating with the

16   authorities when they came, in order to turn over all

17   of the appropriate evidence and so forth that he had

18   seized.

19        And that also applies for subsection 10, in

20   assisting with property.

21        And, Your Honor, these are unusual

22   circumstances.  I mean, whether there -- whether his

23   dogs have gotten out in the past or not, to see your

24   dog shot, you know, in front of your face and to have

25   bullets, you know, whizzing at your wife or in the

1    direction of your wife, those are unusual, and that's

2    not something -- it's not something that I've heard of

3    coming around.  It's kind of bizarre.  And, you know,

4    we think that fits squarely within subsection 11, where

5    it says that he committed the offense under

6    circumstances where it's unlikely to happen again.

7             And he's stated to the Court that he would

8    build this secondary fence, and he's already obtained

9    the materials, so that is something we think will avoid

10   this in the future.

11            And, Your Honor, it appears that through --

12   I'm not political myself, but from what I understand,

13   at least, from Mr. Parsons' testimony today and what

14   little I've seen in the record, that over the course of

15   his life, the only things that have drug him into court

16   are incidents with these dogs getting out, whether he

17   socked some guy in the nose or whether he's been sued

18   or sued someone else over the dogs.

19            It appears that -- I know this is not

20   necessarily the words that Mr. Parsons used on the

21   stand, but it appears, looking at it, that but for the

22   dogs getting out, that Mr. Parsons would not have ever

23   seen the inside of a courtroom.  And we submit to Your

24   Honor that with the completion of this secondary fence

25   that that's an incident that's not likely to happen

1  again.

2              And we'd ask that Your Honor show him mercy in

3  sentencing and find that these mitigating factors

4  apply.

5              THE COURT:  Okay.  General.

6              GENERAL FREELAND:  Yes, sir.  Your Honor, I

7  don't think these are unusual circumstances at all from

8  the proof.  Now, it's unusual if you add the details

9  about bullets whizzing past his ears and in the

10  direction of his wife, but I don't think that's borne

11  out by the facts, and it's not supported by the jury's

12  verdict.

13              It's not unusual circumstance that these

14  hybrids get out.  They've been getting out for six

15  years.  It's resulted in, according to Mr. Parsons,

16  three of them being killed, which I guess would be two

17  in addition to the hybrid that was killed in this

18  incident.  It's led to his punching neighbors in the

19  nose and breaking their nose.  It's nothing unusual

20  about it at all.

21              I don't think -- and Mr. Parsons has been

22  saying he'd take care of the problem, by his testimony,

23  for six years.  I can't imagine the wall that would be

24  necessary to keep this from happening again.

25              As far as his amenability to probation, I

1       think that it's important, and Your Honor has heard

2       Mr. Parsons testify on numerous occasions, to

3       appreciate what his version of reality is as far as his

4       representation of attorneys, as far as his belief that

5       everybody that has lived here from birth or for the

6       last 20 years is against him, that there's some

7       conspiracy, that the district attorney's office is

8       conspiring against him, that officers are conspiring

9       against him, that his attorneys are assaulting him,

10      that Your Honor is conspiring against him, that

11      assistant district attorneys are conspiring against

12      him, his view of the law, of what's civil, of what's

13      criminal, of who determines the law, all of it goes to

14      show that he is a man out of touch with reality, who

15      will not be amenable to any terms of probation unless

16      he passes on their reasonableness.

17              And if Mr. Parsons is the arbiter of what is

18      reasonable, I submit that he's going to be

19      manipulative, he's going to assert his control over

20      things, just as he has or attempted to have over this

21      system.  And my prediction is he's not amenable to

22      probation.  It won't work.

23              THE COURT:  Okay.  Is there anything else you

24      want to present with regard to sentencing?

25              MR. WITHERINGTON:  No, sir.

1          THE COURT:  While there's been a lot of focus

2     on the hybrids, the Court feels like the focus should

3     be on the actions of Mr. Parsons and his confrontations

4     with the neighbors.  The jury accredited the testimony

5     of the victims.  The jury also heard a recording of the

6     actual incident itself.  And the jury has rejected the

7     version that Mr. Parsons presented to the jury, which

8     is the same as he presented here today.

9          The Court has considered the evidence received

10    at trial, the evidence received today, the presentence

11    report, the principles of sentencing, and arguments as

12    to sentencing alternatives, the nature and

13    characteristics of the criminal conduct involved, the

14    evidence and information offered by the defendant on

15    the mitigating factors, the statement that the

16    defendant made in his own behalf, and the need to

17    impose a sentence to reflect the seriousness of the

18    offense, to promote respect for law, and to provide

19    just punishment.

20          The defendant is a standard offender.

21          The Court finds there are no statutory

22    mitigating factors that apply.

23          The victims in this case were threatened with

24    serious bodily injury.  The defendant put a weapon to

25    the head of the victims, told them he would kill them

1    if they did not do as he demanded.

2          There was provocation, according to the

3    defendant's view, but the jury rejected that view.

4          The defendant acted out of anger.  The jury

5    heard the actual tape recording of the incident

6    itself.  The defendant acted with the belief he could

7    do whatever he wanted.  The jury accredited the

8    testimony of the victims, that the wolf was charging

9    and that Mr. Laxton was justified in his actions.

10         Nick King had done nothing toward the

11   defendant.  He was working and minding his own

12   business, yet Mr. Parsons placed a gun on him,

13   threatened him, and continues to express that everyone

14   else is in the wrong and that he acted appropriately.

15         Despite what the defendant alleges, there are

16   not substantial grounds, in this Court's opinion, to

17   excuse or justify his conduct.

18         The Court finds it's a proper case to sentence

19   the defendant, however, to the presumptive or minimum

20   sentence, and the Court sentences the defendant to

21   three years as a standard offender in Count 3.  He will

22   be given credit of time served in September of '07,

23   July of '08, June of '09, and from November 23rd until

24   today.

25         He is sentenced to four years -- I'm sorry --

1    three years in Count 4 as a standard offender, to one

2    year as a standard offender in Count 5, and to 11

3    months and 29 days in Counts 6 and 7 for the

4    misdemeanor offenses of theft.

5           The Court finds, from the evidence, that the

6    defendant is a dangerous offender.  His behavior

7    indicates little or no regard for human life.  He had

8    no hesitation about committing a crime in which the

9    risk to human life was high.

10          He accosted his neighbors with a loaded

11   weapon, threatening to kill them if they didn't do as

12   he demanded.  He held them under gun or threat of gun

13   while he took their property.

14          And the Court finds that consecutive

15   sentencing is reasonably related to the severity of the

16   offenses committed, that it serves the need to avoid

17   deprecating the seriousness of these offenses from the

18   actions of the defendant, serves to protect society

19   from further criminal acts by the defendant who

20   resorted to aggravated criminal conduct, and are

21   generally congruent with the principles of sentencing.

22          The consecutive sentences are justly deserved

23   in relation to the seriousness of the offenses and no

24   greater than deserved for the offenses committed.

25          So the Court sentences the defendant to three

1    years as a standard offender in Count 3, Count 4 will

2    be consecutive, Count 5 will be consecutive, for an

3    effective sentence of seven years.   The misdemeanor

4    sentences will run concurrent with the first three-year

5    sentence.

6          The Court finds that alternate sentencing is

7    not appropriate in this case.   The offenses involved a

8    handgun.   The defendant is not an eligible offender.

9    He was convicted of offenses involving crimes against a

10   person, violent offenses, and offenses in which the use

11   or possession of a weapon was involved.   And therefore,

12   under T.C.A. 40-36-106, is not an eligible candidate

13   for alternate sentencing.

14         The Court further doesn't feel it's a proper

15   case for probation, and that confinement is necessary

16   to protect society and avoid deprecating the

17   seriousness of these offenses.

18         The Court would ask Mr. Witherington to

19   represent the defendant on appeal, if he desires to

20   appeal his conviction or sentence.

21         The Motion for New Trial needs to be filed

22   within 30 days.

23         MR. WITHERINGTON:  Yes, sir.  Thank you, Your

24   Honor.

25         THE COURT:  Counsel filed a Motion for bond to

1    be reinstated, and the defendant filed, pro se, a

2    Motion for bond to be reinstated pending appeal.

3         Bond was revoked after the verdict, pursuant

4    to T.C.A. 40-11-113 and T.C.A. 40-35-116.  The

5    Constitutional right to bail is extinguished upon

6    conviction, and a convicted person is not entitled to

7    bail as a matter of right pending appeal.  The right to

8    bond is subordinate to the public needs and well-being

9    of society, and the Court believes that the defendant

10   poses a threat to other persons in the community, and

11   the bond -- the Court declines the request to reinstate

12   bond.  It will remain revoked pending appeal.

13        Is there anything else we need to cover

14   today?

15        MR. WITHERINGTON:  No, sir.

16        THE COURT:  We stand in recess for a

17   ten-minute break.

18

19        (End of requested proceedings.)

20

21

22

23

24

25

1                          CERTIFICATE

2

3          I, the undersigned Lynn S. Terrell, Official

4    Court Reporter for the Twenty-fifth Judicial District

5    of the State of Tennessee, and Notary Public at Large,

6    do hereby certify the foregoing to be a true, accurate,

7    and complete transcript, to the best of my knowledge

8    and ability, of all the proceedings had and evidence

9    introduced in the hearing of the captioned cause,

10   relative to appeal, in the Circuit Court for Tipton

11   County, Tennessee, on the 8th day of January 2010.

12         I do further certify that I am neither of kin,

13   counsel, nor interest to any party hereto.

14         Dated this 22nd day of June 2010.

15

16

17

18                               **COPY**

19

20                         _____
                           Lynn S. Terrell
21                         Official Court Reporter
                           State of Tennessee
22                         Notary Public at Large

23

24   My commission expires September 14, 2011.

25

59