IN THE GENERAL SESSIONS COURT OF TENNESSEE

FOR THE 25TH JUDICIAL CIRCUIT AT COVINGTON

_____

STATE OF TENNESSEE,                    *
                                       *
                  Plaintiff,           *
                                       *
Vs.                                    *      No. 14-CR-314
                                       *
MICHAEL WAYNE PARSONS,                 *
                                       *
                  Defendant.           *

_____

WHEREFORE, BE IT REMEMBERED that the above-styled cause came on to be heard on this the 11th day of February, 2016, at 1:00 o'clock p.m., before the Honorable William Peeler, Judge, presiding, when and where the following proceedings were had:

APPEARANCES

For the State. . . . . . . . WALTER FREELAND, ESQ.

SALLY A. WORKMAN
Court Reporter
8370 Brunswick Road
Millington, Tennessee 38053
(901) 829-2771
sallysteno@gmail.com

index

## T E S T I M O N Y

| NAME | DIRECT | CROSS | REDIRECT | RECROSS |
|------|--------|-------|----------|---------|
| Edward Danny Johnson | 14 | | | |

## E X H I B I T S

| NUMBER | ITEM | MARKED |
|--------|------|--------|
| 1 | Photo | 22 |
| 2 | " | 23 |

1    THE COURT: Mr. Parsons, have a seat,

2    sir.

3    Now this is in the matter of State of

4    Tennessee versus Michael Wayne Parsons.

5    Mr. Parsons is charged on warrant No. 14-CR-314

6    with being a convicted felon in possession of a

7    firearm. It's Tennessee Code Annotated

8    39-17-1307, subsections e and f.

9    He was charged under that warrant in the

10   General Sessions Court, and then as a result of

11   that new charge, he had his parole revoked and he

12   was subsequently indicted by the Tipton County

13   Grand Jury while he was actually in custody at the

14   Tennessee Department of Correction as a result of

15   his parole violation.

16   Mr. Parsons filed a motion for a

17   preliminary hearing while he was incarcerated and

18   Judge Walker has reviewed that request by

19   Mr. Parsons -- that was done pursuant to Rule 5 --

20   and Judge Walker remanded this case back to the

21   General Sessions Court to conduct the preliminary

22   hearing that Mr. Parsons demanded.

23   I have advised Mr. Parsons of his rights,

24   and on at least three separate occasions I brought

1   him in front of me and asked him if he had an

2   attorney, if he wished to have an attorney

3   appointed by the Court, or if he wished to

4   represent himself.  And I've never been able to

5   get an answer thus far from Mr. Parsons as to

6   whether or not he wanted an attorney, had an

7   attorney, or wished to represent himself.

8        So pursuant to this rule, the Court is

9   required, within certain time constraints, to go

10  ahead and provide Mr. Parsons with a preliminary

11  hearing.  It's not a trial, it's not a

12  determination of guilt or innocence.  It's simply

13  a probable cause hearing, and because I cannot get

14  an answer as to whether or not Mr. Parsons wants

15  an attorney or intends to represent himself, the

16  Court's decided that it's just going to move

17  forward and conduct this preliminary hearing.

18        I reviewed the Circuit Court file and it

19  appears that since March 2015 Judge Walker -- at

20  least on a monthly basis -- Judge Walker has been

21  making the same inquiry of Mr. Parsons as to

22  whether or not he had an attorney, wished to have

23  a court-appointed attorney, or wished to represent

24  himself, and the record indicates that basically

1    Judge Walker has gotten the same answers that this

2    Court has gotten, and that is you can never get an

3    answer.

4         Mr. Parsons always wants to turn the

5    tables and ask the Court questions when what the

6    Court is trying to do is provide Mr. Parsons with

7    counsel, let his counsel answer his questions, and

8    we can never get past that.

9         In fact, I couldn't even get past

10   Mr. Parsons properly identifying himself before

11   the Court.

12        So anyway, the Court has decided that

13   pursuant to Judge Walker's order from the trial

14   court, I'm going to move forward with conducting

15   the preliminary hearing today and I have to assume

16   that Mr. Parsons does not wish to be represented.

17        Now, Mr. Parsons, I'm going to ask you

18   again before I start with this, do you have an

19   attorney?

20             (No response.)

21        THE COURT:  Mr. Parsons?  Do you have an

22   attorney, sir?

23        THE DEFENDANT:  I'm Michael Parsons, not

24   the corporation or trust, which you're pursuing.

1    You do not have jurisdiction.  Judge Walker did

2    not -- none of what you said earlier is true.

3              First of all, I have served this Court --

4              THE COURT:  I got your notices --

5              THE WITNESS:  I'm not an 8-USC 1401-A

6    statutory U. S. citizen, I am not that citizen.

7    This Court does not have jurisdiction.  You're

8    operating administrative court.

9              What you said earlier about this motion

10   to dismiss was a lie.  This is a motion to dismiss

11   the charge in the indictment; this is not a demand

12   for a preliminary hearing.  Read it.  On page 4 --

13             THE COURT:  Judge Walker made that

14   decision, Mr. Parsons.

15             THE DEFENDANT:  You're misquoting the

16   motion.  He did not have the authority.  I did not

17   give him consent to do any ruling on this

18   pertaining to a motion for a preliminary hearing.

19             What I cited was that this is to dismiss

20   the charge on page 3.  The charge must now be

21   dismissed by the authority of Tennessee --

22             THE COURT:  Judge Walker did not do that.

23   He did not --

24             THE DEFENDANT:  This is my motion.  He

1    can only rule on my motion.

2           THE COURT:  He denied it.  He denied it.

3           THE DEFENDANT:  No, he did not.  The

4    record does not show that.

5           THE COURT:  He denied the motion.

6           THE DEFENDANT:  You don't have proof of

7    that.  Put forth the proof that he denied it.

8           THE COURT:  I'm not going to put forth

9    any proof other than what we're going to do today,

10   Mr. Parsons, and we're getting ready to do it.

11          THE DEFENDANT:  You don't have

12   jurisdiction.

13          THE COURT:  The State's -- all right.

14   Here's what we're going to do.  You're going to

15   sit there and be quiet and the State is going to

16   move forward with providing the Court with what is

17   necessary to establish probable cause, if they can

18   do that.  If they can not do that, then the charge

19   will be dismissed.  But that's all we're doing

20   today.  I'm not hearing your argument.

21          THE DEFENDANT:  What jurisdiction is this

22   Court -- I've asked you multiple times, what

23   jurisdiction is this court?

24          THE COURT:  And I told you I'm not

1    answering your question.  I'll appoint an attorney

2    for you --

3                THE DEFENDANT:  No, sir.  You have to

4    tell me, is this an administrative --

5                THE COURT:  I don't have to tell you

6    anything.  I don't have to tell you anything.

7                THE DEFENDANT:  I demand this be moved to

8    a --

9                THE COURT:  Mr. Parsons, I'm going to

10   tell you this.  You can sit there quietly and you

11   can listen to the court proceedings, but if you're

12   going to continue down this road of challenging

13   the jurisdiction of the Court, and you're going to

14   disrupt my hearing, I'm going to have you excluded

15   from the hearing and I'll go ahead and decide the

16   case without you being present.

17               So the record will reflect that once

18   again, for at least the fourth time, I have asked

19   Mr. Parsons if he wanted a court-appointed

20   attorney, and I've also asked him if he wishes to

21   represent himself, and he has not responded for

22   the fourth time.  All Mr. Parsons wants to do is

23   talk about jurisdiction, and the Court's not going

24   to deal with that.

1          THE DEFENDANT:  You can't proceed without

2     jurisdiction.

3          THE COURT:  Watch us.  We're getting

4     ready to --

5          THE DEFENDANT:  That makes this a

6     criminal court.  You're --

7          THE COURT:  It is a criminal court,

8     you're charged with a criminal offense, and you

9     are a convicted felon and you're charged with

10    being in possession of firearms as a convicted

11    felon, and that's what the Court's going to hear.

12    Now --

13         THE DEFENDANT:  The international supreme

14    court overruled that.  I'm no longer a convicted

15    felon.  That charge was overturned by the

16    international supreme court.  I've got the

17    document here to certify you.  I've also --

18         THE COURT:  By some court in British

19    Columbia that represents some --

20         THE DEFENDANT:  It is superior to the

21    United States Supreme Court.  That means it's

22    superior to you.  I'm a Chilcotin native; right

23    here for you to read, sir.

24         THE COURT:  I've got the entire file.

1      THE DEFENDANT:  I'm also an associate

2  justice.  You do not have jurisdiction over me.

3  I'm an internationally protected person.  I demand

4  to be released immediately.

5      THE COURT:  The trier told --

6      THE DEFENDANT:  This is an international --

7      THE COURT:  -- the Court, which I deem to

8  be really a threat and considered to turn it over

9  to Homeland Security.  They, in their

10  correspondence with the Court, said that if I did

11  not release you, they were declaring war on this

12  Court.

13      THE DEFENDANT:  That's not what it says.

14  That's a lie.  That's not what it says.  It says

15  that Tennessee is declaring war on them.  You need

16  to read the document and quit lying about what it

17  said.  You're committing fraud upon the Court.

18      You need to also remove him from the

19  bench right now.  He is a fraud --

20      THE COURT:  Mr. Parsons, here's what it

21  says.  It says:  "Anything short will be deemed by

22  the native people as a declaration of war on your

23  part."  I'm reading that verbatim.

24      THE DEFENDANT:  Your part.  You're

1    declaring war on the native people of the

2    Chilcotin nation.

3          THE COURT:  Well, they're declaring war

4    on me, is what it says.

5          All right.  Well, Mr. Parsons, enough

6    arguing.

7          General, I'm going to ask the State to go

8    ahead and proceed.  The warrant sets out an

9    incident of February 11, 2014, and I've already

10    read Mr. Parsons at one of the previous hearings,

11    which has been recorded on audio and video; I read

12    him all of the factual allegations that were made

13    against him -- and maybe I ought to just read it

14    again just so it's clear in the record.

15          The warrant alleges:  On February 11 the

16    Tipton County Sheriffs Department, Tipton County

17    Animal Control and Dr. Aubrey Haley, DVM, and

18    Michael Parsons' parole officer, Danny Johnson,

19    went to 444 Hughes Road in regards to an animal

20    cruelty complaint from PETA and to conduct a

21    compliance check to determine if Michael Parsons

22    was in compliance with the conditions of his

23    parole.

24          The animals were visually examined by

1   Dr. Haley and appeared to be in satisfactory
2   health and have adequate shelter.
3           Parole Officer Danny Johnson and
4   Investigator Michael Green conducted a search of
5   Parsons' residence.  Inside the residence
6   Investigator Green located two camouflage-type
7   backpacks.  Inside the two packs were
8   approximately 865 rounds of different caliber
9   ammunition.
10          Investigator Green then asked Patricia
11  Parsons if there were any guns in the house and
12  she stated there was a rifle in the bedroom.  She
13  then took me back to their bedroom and pointed to
14  a closet with no door.  I located a Remington 700
15  ADL .308 caliber -- it's got the serial number
16  listed -- rifle.
17          Patricia Parsons stated she did not
18  initially tell me the gun was there because she
19  wanted to protect her husband.
20          Investigators then continued to search in
21  what Patricia called Mike's office.  Investigators
22  located two AR-15 Beta magazines, a Tactical
23  Industries .22 caliber conversion kit for an AR-15
24  and a .22 caliber magazine for an AR-15.

1      Investigator Green spoke with Patricia

2   Parsons and asked her again if there were any

3   other weapons in the house.  She stated she had

4   a .357 pistol in the same bedroom as the rifle.

5   She stated it belonged to her.  I located a Smith

6   & Wesson model 686 -- and it has the serial number

7   listed -- loaded with six rounds of ammunition in

8   a shoe box approximately two feet from the side of

9   the bed.

10      Michael Parsons was arrested for being a

11   convicted felon in possession of a firearm and

12   transported to the jail.

13      That's the charge against Mr. Parsons.

14      General Freeland, I'll ask you to

15   proceed.  This is a preliminary hearing.  The

16   Court is --

17      THE DEFENDANT:  Are we following the

18   rules of court?  The rules of court, do they

19   apply?

20      THE COURT:  The Court has made --

21      THE DEFENDANT:  I object to your Honor

22   reading something into the record that no witness

23   has taken an oath to attest to.

24      THE COURT:  Your objection is noted,

1    Mr. Parsons.  Those are the allegations against

2    you, and that's what the Court is going to decide

3    if there's probable cause.

4              Go ahead, General, let's move on.

5              MR. FREELAND:  The State will call Parole

6    Officer Danny Johnson.

7              THE DEFENDANT:  May I be entitled to have

8    my information that was brought for me to

9    prepare -- since you've had me locked up for a

10   month and I've had no access to legal counsel, may

11   I at least have access to my notes?

12             THE COURT:  Mr. Parsons, you will not

13   acknowledge to me that you are representing

14   yourself.  You won't tell me if you're --

15             THE DEFENDANT:  I'm not a corporate

16   fiction; I'm a live man.

17             THE COURT:  I understand.

18             THE DEFENDANT:  I have rights.

19             THE COURT:  You made it very clear you're

20   a live man, and that you're not Michael Wayne

21   Parsons, and that's been --

22             THE DEFENDANT:  You're coming after a

23   corporate fiction.

24             THE COURT:  What is it you're --

1          THE DEFENDANT:  Are you not the trustee

2      of the Michael Parsons trust?

3          THE COURT:  Mr. Parsons, I'm not going to

4      answer your questions.

5          THE DEFENDANT:  Where's the clerk?  The

6      clerk would be the administrator --

7          THE COURT:  All right, all right.  Move

8      on, General.  Let's hear from the Officer.

9          EDWARD DANNY JOHNSON,

10  the said witness, having been first duly sworn, was

11  examined and testified as follows:

12  DIRECT EXAMINATION

13  BY MR. FREELAND:

14  Q      State your name, please.

15  A      I'm Edward Danny Johnson.  I'm a Parole Officer

16  with the State of Tennessee out of the Jackson Parole

17  Office.

18  Q      How long have you been a parole officer for the

19  State of Tennessee?

20  A      Approximately seven years, sir.

21  Q      So you would have been in that capacity in

22  February 2014, correct?

23  A      That's correct.

24  Q      What does your office cover, geographically?

1   A       My office covers all of Tipton County, and at the

2   time in 2014, I also was parole officer in Haywood

3   County.

4   Q       And among your parolees in 2014 did you have a

5   Michael Wayne Parsons as a parolee for aggravated assault

6   convictions, among other things, out of Tipton County?

7   A       Yes, sir, I was his parole officer.

8   Q       Had you met with him prior to February 11, 2014?

9   A       Had I done what, sir.

10  Q       Had you met with Mr. Parsons?

11  A       Oh, yes, sir, numerous times.

12  Q       Can you identify the Michael Wayne Parsons that

13  you had as a parolee in February 2014?

14  A       Yes, sir, that's him seated right there

15  (indicating).

16                  MR. FREELAND:   The record will reflect

17          that the witness has identified the gentleman in

18          the orange jumpsuit as Michael Wayne Parsons.

19  Q       On that date of February 11, 2014, did you have

20  occasion, along with others, to go to a 444 Hughes Road,

21  Brighton, Tennessee, address?

22  A       Yes, sir, I did.

23  Q       Is that in Tipton County?

24  A       Yes, sir, that's Tipton County, and that's the

1    address where Mr. Parsons resides.

2    Q      Is that the address that that gentleman at counsel

3    table over there gave you as his address?

4    A      Yes, sir.

5    Q      What was the purpose of your going to that address

6    at that time?

7    A      I had been contacted by the Sheriff's Department

8    that there had been a complaint from PETA, which is

9    acronym for People For the Ethical Treatment of Animals,

10   about the animals that Mr. Parsons had on his property,

11   and he had numerous hybrid wolves and various animals,

12   and they asked if I would go out with them and conduct a

13   search and let the veterinarian go and check the animals.

14   That's what the initial thing was.

15         Plus, I'd also take that opportunity to do a home

16   visit while we were there since I had not been in his

17   home in sometime at that point.

18   Q      As a parole officer, you do have a right to make

19   home visits with your parolees; is that correct?

20   A      Yes, sir.  Rule 8 of the Parole states that any

21   parolee in the State of Tennessee agrees to a search of

22   their home, person, vehicle, place of residence, by any

23   probation, parole officer, and law enforcement officer at

24   any time without probable cause, and also that home

1   visits are a normal function with every parolee or
2   probationer that we make from time to time.
3   Q       And you did in fact then go to that location on
4   Hughes Road, correct?
5   A       Yes, sir.
6   Q       Describe to the Court whether or not you made
7   entry into the property, and if so, how.
8   A       Okay.  I was riding in a vehicle with two deputies
9   from the Tipton County Sheriff's Department.  I had
10  called Mr. Parsons to let him know I was coming to do a
11  home visit.  He drove -- his driveway from where --
12  there's a short area you can come off the road.  Then
13  there's a locked gate and it's about three-tenths of a
14  mile from the gate up to his house.
15          On that day he did drive down to the gate in an
16  automobile.  I got out -- I actually had a copy of his
17  parole certificate in my hand with the rules and what
18  have you on it.  He was curious about who else was in the
19  vehicle.  Ended up introducing -- there were people with
20  the Sheriff's Department that I was with, and we needed
21  to come on the property and conduct a home visit and a
22  search.
23          And he denied us access, saying he did not have
24  the key or any way to open the gate to us.

1   Q       So you were on one side of the gate at his
2   property and he was on the other?
3   A       Yes, sir.  This went on for probably 10 or 15
4   minutes, telling him he needed to open the gate.  I think
5   it even mentioned that he was going to be leaving, which
6   if he was leaving, he had to have a way to get the gate
7   open.
8           Eventually he tried to -- I think he tossed his
9   car keys, threw them off to one side.  In fact, I think
10  Mr. Parsons saw some other vehicles parked on the road.
11  He went around the officers and was headed toward the
12  road, and I think they told him to stop and not go there.
13          At that point I think is when he tossed his keys.
14  His keys were recovered.  One of the officers then got in
15  his car and they found -- I think there was actually a
16  remote that would unlock the gate and the gate was
17  eventually unlocked and we proceeded, myself, with the
18  officers, and I think the veterinarian that was there and
19  other officers did get up to the house and conduct a
20  search of the property, checked the animals.
21  Q       Did you go into the house?
22  A       Yes, sir, after they -- they did conduct a search
23  and the animals found -- I think the veterinarian found
24  that the animals were fine, they had adequate shelter,

1    wasn't a problem there.

2          While Mr. Parsons, I think, was talking with other

3    officers, myself and Investigator Green approached

4    Mrs. Parsons and I told her we needed -- I needed to

5    check the house because I had not been in the house in

6    sometime.

7    Q      Can you see the person you're describing as

8    Mrs. Parsons in the courtroom?

9    A      Yes, sir, she seated on this row in the kind of

10   greenish-colored top there with glasses.

11   Q      That was the lady that you saw and was identified

12   to you as Mrs. Parsons, the wife of Mr. Parsons, correct?

13   A      Yes, sir.

14   Q      Was there anybody else in the residence?

15   A      Not at the time.  She unlocked the door for us to

16   go into the residence.

17   Q      Other than law enforcement, were Mr. and Mrs.

18   Parsons the only ones in the residence?

19   A      Mr. Parsons was not in the residence at the time

20   we went in and searched.  He was around another building

21   speaking to officers.

22   Q      Only Mrs. Parsons was in the residence, correct?

23   A      It was myself, Investigator Green, and

24   Mrs. Parsons.

1   Q       Describe the layout physically -- not in minute
2   detail -- but generally as to the size of the residence.
3   A       In the entry door we went in, and off to the right
4   there was a room with a desk.  I recall it had a laptop
5   on it.  There was a lot of boxes and things, and a couple
6   of camouflage backpacks on the thing.  I did -- as we
7   stepped in, I did ask Mrs. Parsons if this was Michael's
8   office and she said, Yes, it was, and I pointed at the
9   camouflage bags and asked her if those were his "go
10  bags," like, you know, if there was an Apocalypse or
11  something came.  She said, "Yes, those are Michael's 'go
12  bags.'"
13          Investigator Green and I -- I think from there,
14  just to the left there's like the kitchen area, then you
15  have a hall on down left goes into the bedroom at the end
16  of this mobile home.
17          We did enter Mr. Parsons's -- what his wife
18  identified as his office.  Began to look through the bags
19  that she identified as his bags, and it was in those bags
20  we found several hundred rounds of ammunition.  A good
21  portion of that was that .308 ammo that would be used in
22  the weapon, the rifle that was later found in his
23  bedroom.  We found in fact there were two -- I think a
24  couple of -- I can't remember if it was 50- or 100-round

1   drum-type ammo magazines that would fit an AR-type

2   weapon.   There was a bayonet.   Just a lot of different

3   things.   There were many different calibres.   I think

4   there were .22 ammunition, may have been .357 magnum.   I

5   know .308 -- a lot of .308 magazines.

6         We did find some parts and things -- we never

7   found an AR-type weapon, but we did find an AR conversion

8   kit, to convert like 223-round AR to be able to fire .22s

9   that somebody, if they wanted to practice but not spend a

10  lot of money on ammo, they could convert their regular

11  weapon that normally shot a 223-round shoot .22.

12        I think while I was still in there Investigator

13  Green asked Mrs. Parsons if there were any weapons in the

14  house.   At that time she did say something to him about

15  there was a rifle in the bedroom.   He went down the hall

16  with her and shortly thereafter came back into the

17  kitchen area carrying a box with a scoped AR rifle .308

18  caliber.

19        He did ask her also, I think a little bit later,

20  if there were any other weapons in there.   She said there

21  was a pistol, and when he went back in the bedroom he did

22  find a loaded .357 magnum pistol in a -- I can't remember

23  if it was in a shoebox or some kind of box that was

24  within a couple feet of the bedside.

1   Q      Did you see Investigator Green with what you

2   described as the handgun and the rifle?

3   A      Yes, sir.

4   Q      Let me, if I could, pass you a photograph and ask

5   you if you can identify -- if you recognize what that

6   depicts?

7   A      This does appear to be the handgun, sir.

8              MR. FREELAND:  Your Honor, we move to

9         make that photograph the next-numbered exhibit.

10             THE DEFENDANT:  I object.  The evidence

11        that's available and the evidence -- I do not

12        recognize the pictures as reliable.

13             THE COURT:  Your objection is overruled,

14        Mr. Parsons.  The Court will accept the photograph

15        in lieu of bringing this gun into the courtroom.

16             It will be marked as Exhibit 1.

17             (Photo was marked as Exhibit 1.)

18             THE COURT:  Go ahead, General.

19   BY MR. FREELAND:

20   Q      Let me show you another photograph and ask if you

21   can identify what this depicts, if you can.

22             THE DEFENDANT:  Can I be provided access

23        to see these exhibits?

24             THE COURT:  Certainly.  Now, Mr. Parsons,

1          here's the thing that troubles me, and I'm not

2          going to get into arguing with you.  But you have

3          never told me that you're representing yourself.

4          So as far as I'm concerned you're not

5          representing.  You don't have hired attorney, you

6          don't have court-appointed attorney, and you will

7          not acknowledge to the Court that you want to

8          represent yourself.  So I'm doing you a favor by

9          passing those documents to you, and I'm going to

10         let you look at them.  You can look at them.  You

11         asked to look at them, and there they are.

12                    Now move on, General.

13    A     That is the -- does appear to be the weapon that

14   we took out of the house that day that was found in the

15   closet by -- well, Mrs. Parsons showed Investigator Green

16   where it was.

17                    MR. FREELAND:  Your Honor, we move to

18         have that second photograph of the rifle marked.

19                    THE COURT:  That will be marked Exhibit

20         2, and I'll have the Court officer show that to

21         Mr. Parsons.

22                    (Photo was marked as Exhibit 2.)

23   BY MR. FREELAND:

24    Q     Do you know who holds as evidence the .357 handgun

1   and the Remington .308 rifle?

2   A      It's my understanding it's in the evidence room

3   here at the Tipton County Justice Center.

4   Q      As a parole officer, would you ever be an evidence

5   custodian?

6   A      No, sir, I'm not.

7   Q      Did you see -- and looking in the backpack

8   described to you as being Mr. Parsons' backpack, did you

9   find ammunition compatible with a Remington .308 caliber

10  rifle?

11  A      Yes, sir, a great deal of it.

12  Q      Did you have any ammunition compatible with a .357

13  handgun?

14  A      I believe we did.  I can't say with absolute

15  certainty right now.  I know the .308 rounds were there.

16  I'm not sure about the .357.  The .357 was loaded when we

17  found it, though.  It had rounds in it.

18  Q      Is the mere possession of the ammunition a

19  violation of parole?

20  A      No, sir.  That would be a violation if he was on

21  probation.  It's not a violation to have ammunition on

22  parole, which is an extraordinary difference in the

23  rules.

24  Q      But the handgun possession and the possession of

1   the rifle led ultimately, of course, to violation of

2   parole; is that your understanding?

3   A       Yes, sir.  They are -- a handgun and a long gun of

4   any type is a violation of parole, and of course, the

5   law.

6                   MR. FREELAND:  That's all I have.

7                   THE COURT:  Thank you, sir.  You can step

8       down.

9                   Do you have any other witnesses, General?

10                  MR. FREELAND:  No, sir.  Your Honor.

11                  THE DEFENDANT:  Can I cross-examine this

12                  THE COURT:  No, sir.

13                  UNIDENTIFIED FEMALE:  Your Honor, may I

14      speak?

15                  THE COURT:  No.

16                  MR. FREELAND:  Your Honor, I would like

17      to make as the next exhibit certified copies of

18      Tipton Circuit 6030 which indicate that on

19      November 23, 2009, Mr. Parsons was convicted of an

20      aggravated -- actually two counts of aggravated

21      assault, Counts III and IV of Docket No. 6030, and

22      I'd like to submit that, your Honor.

23                  THE COURT:  That's the proof of

24      conviction of felony?

1          MR. FREELAND:  Certified copies of those

2     convictions out of the Circuit Court in Tipton

3     County.

4          THE COURT:  All right.  Now I thought

5     long and hard about this hearing and how the Court

6     was going to conduct it, and the Court has wide

7     latitude in the preliminary hearing stage.  All

8     that is required is for the State to show that

9     there's probable cause.  The Court is not required

10    to hear -- not required to hear evidence of

11    defense or alibi or whatever.  All that the Court

12    is required to look at is whether there's probable

13    cause for the warrant to stand.

14          The State's put on sufficient evidence to

15    show the Court that there is probable cause for

16    the warrant to stand.

17          Mr. Parsons will not acknowledge to the

18    Court that he has an attorney, wants an attorney,

19    or even that he's representing himself.

20          So the Court is finding probable cause at

21    this point.

22          I'm concluding the hearing --

23          THE DEFENDANT:  The State's witness

24    testified he didn't have -- I didn't have

1   possession.  He sat there and testified I didn't

2   have possession; they were locked in a locked

3   house.  Under 39-17-1307 the exception is if the

4   guns are locked up.  I'm not in possession.  He

5   sat there and proved I didn't have possession.

6           THE COURT:  All right.  The Court

7   listened to the evidence.  The Court finds

8   probable cause.  The case will be bound over to

9   the Grand Jury.

10          THE DEFENDANT:  The Judge is a crook.

11          THE COURT:  Now on the issue of bond, the

12  Court has also thought long and hard about that.

13  The Court has reviewed the Circuit Court files and

14  the transcripts that are in the file.  Mr. Parsons

15  was convicted of two counts of aggravated assault

16  and two counts of misdemeanor theft, and he

17  received an effective sentence of seven years out

18  of the Circuit Court.  Evidence presented at that

19  time established that Mr. Parsons had threatened

20  his victims with serious bodily injury, he had

21  pointed a gun at their heads, he had threatened to

22  kill them, and he had counted down while he was

23  holding the victims at gunpoint, and then he took

24  the victims' property while he held them at

1    gunpoint.  All --

2               THE DEFENDANT:   That was never alleged in

3    the trial.  The Judge made it up to send me to

4    prison.

5               THE COURT:   Also, the evidence was and

6    the testimony in that hearing was there had been

7    other altercations with neighbors, and on one

8    occasion he had struck a neighbor in the face and

9    had actually broken his nose.

10              After Mr. Parsons's parole was violated

11   on those new charges -- and he has the new charges

12   that are before this Court of possession of

13   firearms by a convicted felon.

14              Mr. Parsons will not acknowledge the

15   authority or the jurisdiction of this Court, and

16   in fact I couldn't even on the first day, get past

17   him identifying himself with his proper name, and

18   I could not get Mr. Parsons to answer the

19   questions of the Court, to respond to the

20   questions of the Court, and it is clear --

21              THE DEFENDANT:   The Court won't respond

22   to --

23              THE COURT:   -- he does not accept the

24   authority of this Court --

1    THE DEFENDANT:  You don't have

2    jurisdiction, you don't have authority.

3    THE COURT:  It continues on.

4    THE DEFENDANT:  I have not consented to

5    give you jurisdiction.

6    THE COURT:  He has stated his intention

7    to go to Canada.  There have been letters --

8    multiple letters sent to the Court --

9    THE DEFENDANT:  I will be here -- if

10   called upon, as I always have -- I've been here

11   every time the Court has invited me to be here.

12   I've never not once missed a court appearance when

13   I've been asked to appear.

14   THE COURT:  The letters of the tribe

15   indicate that because of Mr. Parsons's standing in

16   the tribe and his appointment to associate

17   justice, that he has the right to freely travel

18   without interference, obstruction, or restraint

19   across borders to other countries and that he

20   enjoys internationally protected status and

21   diplomatic immunity, which creates great concern

22   for the Court.

23   THE DEFENDANT:  That is the Jay Treaty

24   which this Court --

1          THE COURT:  If he were to go to Canada

2     under the protection of tribal law, it would be

3     virtually impossible for this Court to regain

4     jurisdiction over him.

5          There have been threats made by the

6     Chilcotin nation to this Court stating that if

7     Mr. Parsons is not released, that they will deem

8     this as a declaration of war against this Court.

9          Based on all of that, the Court --

10         THE DEFENDANT:  War against the court.

11         THE COURT:  -- believes that Mr. Parsons

12    is a danger to the community and a danger to

13    others, based on his conviction of these incidents

14    involving dangerous --

15         THE DEFENDANT:  Mr. Braxton (sic) shot at

16    my wife and my dog twenty-nine times.  I said

17    "Stop shooting."

18         THE COURT:  Okay.  All right.  The Court

19    finds him to be a danger to others and to the

20    community and also to be a flight risk, and he'll

21    be held without bond to be presented before Judge

22    Walker with the court date most likely being March

23    14, which would be State's day.

24         MR. FREELAND:  Yes, sir.

31

1          That concludes the matter.

2          Sheriff, take Mr. Parsons into custody.

3     This Court's through with this matter.

4          THE DEFENDANT:  I would order the Court

5     to return the property my wife gave back to

6     Mrs. Parsons.  That is her property.

7          MR. FREELAND:  What property are you

8     asking to be returned to your wife as her

9     property?

10         THE DEFENDANT:  The files that she

11    presented that were to be given to me that were

12    never given to me.  That needs to go back to her.

13         THE COURT:  I don't know who has those,

14    Mr. Parsons.  I don't have them.

15         THE DEFENDANT:  Did you get it back?

16         MRS. PARSONS:  No.

17         THE DEFENDANT:  These officers have her

18    property.  They need to return it immediately.

19    And I would also ask that her physical property be

20    returned.  Since you've got me locked up,

21    obviously there's no concern -- she needs

22    protection for herself.  That's her property.

23         THE COURT:  That's evidence.  You go

24    ahead.

1          MR. FREELAND:  Your Honor, I'm curious as

2    to what physical property belongs to Mrs. Parsons.

3          THE COURT:  Well, the guns, I guess is

4    what he's talking about.  But that's evidence.

5          THE DEFENDANT:  All these notes right

6    here belong to my wife.

7          THE COURT:  Those were never presented to

8    the Court and I don't have those.  So as far as

9    I'm, concerned, she can have them back.  The

10   record will reflect they were never turned over to

11   the Judge, I never looked at those, so we'll

12   certainly just return those, undisturbed, back to

13   Mrs. Parsons.

14          That concludes the case.  The Court will

15   stand adjourned.

16          (HEARING CONCLUDED)

17

18

19

20

21

22

23

24

33

STATE OF TENNESSEE                    ss              C E R T I F I C A T E

COUNTY OF SHELBY

I, Sally A. Workman, Notary Public at Large for

the State of Tennessee, do hereby certify that I reported

in machine shorthand the foregoing hearing, STATE vs.

MICHAEL WAYNE PARSONS.

I hereby certify that the foregoing pages were

printed under my personal supervision and that they con-

stitute a true record of the proceedings had.

I further certify that I am not an attorney nor

counsel of any of the parties, nor a relative or employee

of any attorney or counsel connected with the action, nor

am I financially interested in the action.

Witness my hand and official seal in the State

of Tennessee on February 15, 2016.

SALLY A. WORKMAN,
Court Reporter, and
Notary Public

My Commission Expires:
    March 23, 2016
    TN License #481